UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| PARLEY DREW HARDMAN, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Case No. 3:09-0589 |
| ) | (Crim. Case No. 3:02-00179) |
| ) | Judge Echols |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM

Pending before the Court is Petitioner Parley Drew Hardman's "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody" (Docket Entry No. 1). Petitioner has filed a Memorandum in support of his Motion (Docket Entry No. 6), the Government has filed a response in opposition to the Motion (Docket Entry No. 21), and Petitioner has filed a "Traverse" to the Government's response (Docket Entry No. 32).

### I. FACTUAL BACKGROUND

After a jury trial, Petitioner was convicted of (1) solicitation to commit a federal crime of violence, that being the interstate stalking of his ex-wife, Cherylynn Collins ("Collins"); (2) solicitation to commit Collins' murder; and (3) conspiracy to commit the interstate stalking of Collins. At trial, the evidence showed the following.

Petitioner met Collins in middle Tennessee in January 1999 when Collins was working at her second job as a dance instructor. In March 1999, Collins' father died and, two months later, she moved back to Michigan to live in her father's house on Pacific Street in Plymouth, Michigan.

While Collins was in Michigan, she and Petitioner continued to communicate and Petitioner visited Collins in Michigan, mostly on the weekends. From his visits, Petitioner knew the layout of the Pacific Avenue home, and knew that Collins had a cocker spaniel named Maggie.

In January 2000, Collins and Petitioner became engaged and they married in August 2000. Collins rented out the residence on Pacific Avenue and moved to Murfreesboro, Tennessee, to live with Petitioner with the understanding that, in the near future, they would return to live in Michigan.

Things did not go as planned because Petitioner did not want to move to Michigan. The couple separated in July 2001, and Collins testified that this was prompted by Petitioner physically assaulting her, telling her that he would not be moving to Michigan, and threatening her with "harm." Collins moved back to Plymouth, stayed for a couple of months in her mother's house and then moved into the home on Pacific Avenue.

After Collins returned to Michigan, Petitioner met Marvin Droznek ("Droznek"), a/k/a Marvin Drake, an admitted loan shark. Droznek was previously in the federal Witness Protection Program, having testified against the Mafia in Western Pennsylvania in the late 1980's. After being released from prison in 1990, Droznek moved to Nashville, Tennessee.

Petitioner learned about Droznek's loan sharking activities from Laura Tucker, one of Droznek's customers. Initially, Petitioner told Droznek he was interested in securing a loan, but, when Petitioner learned of Droznek's alleged mob connections, Petitioner's interest quickly evolved into having someone intimidated or hurt. Specifically, Petitioner told Droznek in May 2002, that Collins needed to be punished because she had "sullied" Petitioner's reputation, ruined him financially, and accused him of an inappropriate relationship with his underage daughter. When asked exactly what he wanted done, Petitioner told Droznek he wanted Collins legs' broken because she was a dancer, and her dog killed. Petitioner also stated that if Collins was killed in the process, "so be it."

Over the next couple of months, Petitioner repeatedly called Droznek and mentioned on numerous occasions that he wanted Collins killed. These conversations took place over the phone,

2

or in person at the Waffle House or the Scoreboard sports bar on McGavock Pike in Nashville. Droznek believed that Petitioner was serious about having Collins killed.

Droznek eventually told Petitioner that it would cost $20,000.00 to have Collins killed. Not having the means for that result, Petitioner "settled" on having Collins' legs broken and her dog killed. The parties agreed on $2,000 for such services, plus expenses. When Petitioner was asked whether he wanted Collins' legs broken in such a way that they could heal "nicely," Petitioner responded in the negative and maintained that he wanted Collins' legs ruined so that her dancing career would be over.

To carry out the task, Droznek enlisted the aid of Joe Roselli, a/k/a Joe Lucas, another former mobster who also had been placed in the government's Witness Protection Program after testifying against another arm of the mob in New York. In June or July 2002, Petitioner provided Droznek with a packet of information which contained Collins' home address, a sketch of the floor plan of the home, the address of her dance studio, her work schedule, and a list of her customary activities. The packet also included pictures of Collins, her dog, and a necklace that Petitioner wanted taken so that Collins would understand that Petitioner was responsible for the harm inflicted. Petitioner also wanted the necklace taken from Collins so he would know the attack actually happened.

Droznek gave Roselli the information packet and Roselli went on a "scouting trip" to Plymouth. Upon his return, Roselli told Droznek that the information provided by Petitioner was essentially accurate. Droznek then contacted Petitioner, told him about the scouting trip, and requested $700.00 for expenses which Petitioner provided. Petitioner expressed his pleasure that things were going forward.

Unbeknownst to both Petitioner and Droznek, Roselli contacted federal authorities after he had been offered the job. Federal agents, in turn, contacted Collins and told her of the plot. Agents staged a fake attack on Collins and provided Roselli with the necklace that Petitioner wanted as proof.

3

On August 8, 2002, Roselli reported to Droznek that he had completed the mission, but it was not as successful as expected. Roselli said he was only able to break one of Collins' legs because the attack occurred while Collins was walking her dog, and, during the attack, the dog created a "ruckus" causing someone in the home to turn on lights. Nevertheless, Roselli stated that the leg he broke was hit with such force by a 2 x 4 that it caused the wood to shatter.

Droznek called Petitioner to report the results and Petitioner said, "That's great." Droznek subsequently met with Petitioner and gave him the necklace which had been taken from Collins. Petitioner was so happy he became "bubbly," although he did express some dissatisfaction that both legs were not broken as requested.

A few days after the "attack," Collins received flowers from Petitioner with an enclosed note which read, "sorry about your unfortunate incident." Sometime shortly thereafter, Petitioner received an anonymous letter and a CD which contained the song "You're as Cold as Ice" repeated 22 times.

On September 20, 2002, Droznek was arrested in an unrelated reverse drug sting operation. He agreed to cooperate with the authorities, told them about the plot Petitioner had hatched to injure or kill Collins, and his role in the incident. He agreed to meet with Petitioner and to wear a wire to record the conversation.

That same day, Droznek met Petitioner at the Scorecard sports bar where Petitioner discussed the Collins matter and also discussed other possible jobs Droznek might be interested in, including killing country music singer Travis Tritt. During the meeting, the conversation between Droznek and Petitioner was recorded. Outside in the parking lot, Droznek gave Petitioner the information packet which had been provided to Roselli to aid in his contract job to injure or kill Collins in Michigan. Petitioner was then arrested by awaiting agents.

As indicated, Petitioner was convicted of the three charges contained in the Indictment. He was sentenced to a term of imprisonment of 180 months on each of the solicitation charges, and 60

4

months on the conspiracy charge, with all three sentences to be served concurrently. Those sentences were to be followed by a five-year term of supervised release.

Petitioner appealed both his conviction and his sentence. Petitioner's conviction was affirmed, but the sentence was remanded for reconsideration in light of United States v. Booker, 543 U.S. 220 (2005). United States v. Hardman, Slip Op. No. 04-5249 (6th Cir., January 30, 2006). On remand, the Court imposed the same sentence and that sentence was affirmed on appeal. United States v. Hardman, Slip Op. No. 06-5798 (6th Cir., March 28, 2008). His present § 2255 petition followed.

## II. STANDARD OF REVIEW

To prevail on a § 2255 motion, the Petitioner must establish either an error of constitutional magnitude that had a substantial and injurious effect or influence on his criminal proceeding, see Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993), or the record must reflect a fundamental defect in the proceedings that inherently resulted in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure. Reed v. Farley, 512 U.S. 339, 348 (1994); United States v. Todaro, 982 F.2d 1025, 1028 (6th Cir. 1993). Claims of error must be raised in the trial court and on direct appeal or such claims are procedurally defaulted. See Phillip v. United States, 229 F.3d 550, 552 (6th Cir. 2000).

Under Rule 8 of the Rules Governing Section 2255 Proceedings, the Court "must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Petitioner is not entitled to an evidentiary hearing if the § 2255 motion and the record of the case conclusively show that he is not entitled to relief. See Green v. United States, 65 F.3d 546, 548 (6th Cir. 1995). Finally, when the trial judge also hears the collateral proceedings, the judge may rely on his recollections of the prior proceedings in ruling on the collateral attack. Blanton v. United States, 94 F.3d 227, 235 (6th Cir. 1996).

5

### III. ANALYSIS

In his Section 2255 Motion, Petitioner raises two grounds, both of which relate to the alleged ineffective assistance of his counsel. In ground one, Petitioner claims trial counsel, John Cauley ("Cauley"), was ineffective in failing to allow Petitioner to testify. In his second ground, Petitioner claims that appellate counsel, Matthew Robinson ("Robinson"), was ineffective because he did not raise on direct appeal Cauley's alleged ineffectiveness in relation to Petitioner not being allowed to testify at trial.

To establish ineffective assistance of counsel, Petitioner must show that his counsel's performance was deficient and that the deficiency prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687 (1984); Evitts v. Lucey, 469 U.S. 387, 396 (1985). Petitioner must show that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment, and that there is a reasonable probability that the lawyer's errors prejudiced the outcome of the proceedings against him. Strickland, 466 U.S. at 687; Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999).

A reasonable probability is one sufficient to undermine confidence in the outcome; it is a less demanding standard than "more likely than not." Strickland, 466 U.S. at 697. A court need not address both parts of the Strickland test if the Petitioner makes an insufficient showing on one. Id.

At trial, Petitioner was not called as a witness. He claims this was error and amounted to ineffectiveness of counsel for two interrelated reasons. First, Petitioner wanted to testify, but Cauley would not let him testify. Second, Cauley promised the jury that Petitioner would take the stand, but that promise went unfulfilled.

In response to the § 2255 Motion, the Government has filed an Affidavit from Cauley in which he states the following:

6

5. In preparation for the trial, I met with Mr. Hardman numerous times and spoke with him by telephone. Among other things, we discussed the advantages and disadvantages of having Mr. Hardman testify at trial.

6. The trial began on March 25, 2003.

7. Initially I believed that Mr. Hardman would be exercising his constitutional right to testify at the trial, and I made reference to it in my opening statement. As the trial progressed, Mr. Hardman and I continued to discuss whether he should testify. As the case progressed, I believed that it was unnecessary for Mr. Hardman to testify and that, in fact, it might hurt our case for him to testify. I made my opinions known to Mr. Hardman but allowed him to make the final decision about his constitutional right to testify. He ultimately agreed with me and chose not to testify.

(Docket Entry No. 21-1 at 1-2, internal citation to Clerk's Resume of Trial omitted). In his "Traverse" to this filing, Petitioner writes that "[a]t no time did defense counsel discuss with hardman [sic] that he would not or should not take the stand." (Docket Entry No. 32 at 2).

At first blush, it would appear that the disputed versions about what actually occurred regarding Petitioner's failure to testify require a hearing. However, the Sixth Circuit "entertains a strong presumption that counsel adhered to the requirements of professional conduct and left the final decision about whether to testify with the client." Hodge v. Haeberlin, 579 F.3d 627, 639 (6th Cir. 2009). "To overcome this presumption, [Petitioner] would need to present record evidence that he somehow alerted the trial court to his desire to testify." Id. In this regard, the Sixth Circuit has stated:

> A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel. At base, a defendant must alert the trial court that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand. When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct. Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so.

United States v. Webber, 208 F.3d 545, 551 (6th Cir. 2000)(internal citations and quotation marks omitted).

7

In this case, at no time during trial did Petitioner alert the Court that he wanted to testify or that he had a disagreement with counsel about whether he should take the stand. This is particularly significant since counsel first represented that Petitioner would take the stand, Petitioner did not take the stand, and, during closing, counsel indicated that the reason Petitioner did not take the stand was because "[i]t just simply wasn't necessary, but it was a decision that he and I made together[.]" (Tr. Trans. 574-575).

Notwithstanding the unequivocal representation by counsel that he and Petitioner reached a mutual agreement that Petitioner would not testify,[1] Petitioner never alerted the Court that he did, in fact, want to testify. He did not mention any alleged dissatisfaction with not being called as a witness in the three post-conviction letters to the Court where he complained about counsel and the government's actions. (Case No. 3:02-CR-00179, Docket Entry Nos. 48, 49 & 57). Instead, in hindsight, he now makes unsupported allegations to that effect. Petitioner's "present allegations that he wanted to testify and was prevented from doing so do not suffice to overcome the presumption that he assented to the tactical decision that he not testify." Hodge, 579 F.3d at 639.

Petitioner also claims trial counsel was ineffective because he failed to deliver on his promise that Petitioner would testify. In his opening statement, Cauley said:

> You will hear from my client, Mr. Hardman, who will tell you what his involvement was in this. It is not what the government believes it to be. Mr. Hardman does not fault the FBI for what they did. They acted on information they received from criminals. They had no choice but to do that. But the criminals shouldn't be trusted to relay truthful information. Look to their motives to puff themselves up, and just be open minded. I ask you to listen to all witnesses carefully. This is not what it appears to be right now. Thank you.

---

[1] Interestingly, Petitioner attaches to his § 2255 Motion pages from the trial transcript relating to counsel's opening and closing, but neglects to submit the page which indicated that both he and counsel agreed that Petitioner should not testify.

8

(Tr. Trans. at 23-24). In his closing argument, Cauley addressed Petitioner's failure to take the stand and said:

> The one thing that I did as an attorney, and it is one of those things that they teach you in a very basic litigation course, is you don't promise a jury something that you are not going to give them. I did that. I told you that you would hear from my client, and you didn't. That was a mistake that I made. You will be instructed not to hold that against him. It just simply wasn't necessary, but it was a decision that he and I made together.

(Id. at 574-75).

In support of his position that counsel was ineffective when he promised the jury that it would hear from Petitioner, Petitioner relies primarily upon McAleese v. Mazurkiewicz, 1 F.3d 359 (3rd Cir. 1993) and Hampton v. Leibach, 347 F.3d 219 (7th Cir. 2003). Those cases are distinguishable, are not controlling, and do not stand for the proposition that the mere failure to keep a promise made in opening statements constitutes ineffective assistance of counsel.

McAleese dealt with a claim that counsel purportedly promised during opening statements that he would produce an alibi witness to testify on defendant's behalf. As Petitioner observes, the Third Circuit wrote that "[t]he failure of counsel to produce evidence which he promised the jury during his opening statements that he would produce is indeed a damaging failure sufficient of itself to support a claim of ineffectiveness of counsel." McAleese, 1 F.3d at 166. That broad language is clearly "dictum," United States v. Kemp, 362 F. Supp.2d 591, 594 (E.D. Pa. 2005), because the Third Circuit found that counsel in that case did not make any such promise. Moreover, that language conflicts with the Third Circuit's later observation that "even if we could imply into the opening a promise to" call the alibi witness, counsel's "later decision not to do so is not necessarily ineffective." McAleese, 1 F.3d at 167. Indeed, the Third Circuit ultimately reversed the district court's grant of habeas relief by concluding that counsel's mid-trial decision not to call the alibi witness was a "reasoned, strategic decision." Id. at 168.

9

Closer factually is Hampton. There, counsel promised in opening statements that defendant would testify and that there would be evidence showing defendant was not affiliated with a gang. Neither promise was kept, and counsel "reneged on his promises without explaining why he did so." Hampton, 347 F.3d at 257. While the Seventh Circuit found that counsel was ineffective, that finding was not based upon breach of the promises alone. Rather, the Seventh Circuit recognized that "turnabouts of this sort may be justified when 'unexpected developments . . . warrant . . . changes in previously announced trial strategies.'" Id. at 257 (quoting, Ouber v. Guarino, 293 F.3d 19, 29 (1st Cir. 2002)). Ultimately, the Seventh Circuit concluded counsel's "breach of the promises he made in the opening statement was not so prejudicial that it would support relief in and of itself, [but that] breach serve[d] to underscore the more important failure to investigate the exculpatory occurrence witnesses." Id. at 260.

Here, Petitioner's claim is based upon counsel's singular statement that Petitioner would take the stand,[2] but Petitioner did not testify. Counsel explained during closing that he made a "mistake" and that the defense jointly (counsel and Petitioner) determined Petitioner's testimony was no longer necessary. Obviously, "once the trial was underway, defense counsel reconsidered," and even if the given "reasons now might seem insufficient," the court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance of counsel

---

[2]Petitioner also claims the Government "attempt[ed] to capitalize on Cauley's blunder," (Docket Entry No. 6 at 7), but that misconstrues the record. During closing, the prosecutor argued that the defense "promised that you would hear from the defendant about his involvement in this case," whereupon Cauley immediately objected. At a sidebar, Cauley argued that the statement was an improper reference to Petitioner's right to remain silent. In response, the Government explained that it was making no such comment, but instead was going to argue that Petitioner kept his word, and that the jury did in fact hear from the Petitioner by way of the tape recorded conversation between him and Droznek. After the sidebar, the Government continued by arguing that the jury heard from the Petitioner in the taped conversation. Petitioner's argument on direct appeal that the Government improperly commented on his decision not to testify was found to lack any merit. Hardman, Slip. Op. No. 04-5246 at 3-4.

because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight.'" Williams v. Bowersox, 340 F.3d 667, 672 (8th Cir. 2003)(quoting, Bell v. Cone, 535 U.S. 685, 702 (2002)).

"The complex dynamics of trial engender numerous missteps, but only the most inexcusable will support a finding that counsel's performance was so substandard as to compromise a defendant's Sixth Amendment right to proficient legal representation." Ouber, 293 F.3d at 27. Counsel's admitted "mistake" in this case does not rise to that level.

In his supporting brief, Petitioner writes:

> The facts here are indisputable, the government's star witnesses were career criminals. Joseph Roselli was involved with organized crime, as was Droznek. Hardman was without a criminal history, with testimony the jury needed to hear. Hardman could have told the jury that the alleged plot to harm his ex-wife was impossible based on their testimony. Hardman knew his ex-wifes [sic] habits, where she went and what she did. Hardman could have punched holes in their testimony mainly because of actual events.

(Docket Entry No. 6 at 9). Petitioner's contention that he could "punch holes" in Droznek's and Roselli's testimony and his contention that he could show the jury how the plot was "impossible" are conclusory and unsupported statements and, as such, are not sufficient to establish an ineffectiveness of counsel claim. See, Cross v. Stovall, 238 Fed. Appx. 32, 38 (6th Cir. 2007)("ineffective assistance of counsel claim is doomed by the fact [petitioner] makes nothing more than conclusory assertions").

As for the credibility of Droznek and Roselli, those issues were fully developed during argument and on direct and cross-examination of those witnesses. Both were shown to have extensive criminal histories, and both were shown to have motivation to slant their testimony in favor of the Government.

The theme of counsel's opening, and the subject on which he suggested Petitioner was going to testify, was that neither Droznek nor Roselli could be trusted because they were criminals and, therefore, their portrayal of the events leading up to the "attack" on Collins could not be believed.

11

During trial, the jury learned that both Droznek and Roselli had been involved in the Witness Protection Program because both had testified against the Mafia in organized crime trials. They also learned that both operated under assumed names because of their past relationship with the Mafia.

With regard to Droznek, the jury heard that after testifying against the mob, he served time in prison. He admitted to being a loan shark by trade and that collection of loans sometimes involved the infliction of physical harm. The jury further heard that Droznek was willing to contract out a killing if the price was right. On cross-examination, Droznek admitted that he had just pled guilty to a host of crimes in this case and another which could lead to imprisonment of anywhere from twenty years to life, and that he was testifying for the prosecution in an effort to reduce his sentence. Droznek further admitted during cross-examination that he had considered having his ex-wife killed after his divorce had cost him $45,000.00.

The jury also learned from Roselli that he was a former member of John Gotti's crew who turned government witnesses. He admitted convictions for Hobbs Act violations, arson, loan sharking, conspiracy to commit burglaries, credit card fraud and "various other crimes." Through cross-examination, Roselli was made out to be the consummate criminal who had limited contact with Petitioner. Roselli wanted to ingratiate himself with Droznek whom he still believed to be a mobster, believing that if he was successful in entering into criminal activities with Droznek this would help Roselli get back into the Witness Protection Program. Roselli testified he was afraid that if he did not get back in the program he would be hurt or executed by his former mob associates. Cauley had Roselli explain his involvement with Droznek in loan-sharking operations, Roselli's belief that he could enter into a profitable cocaine trafficking relationship with Droznek, and Roselli's budding involvement with the Russian mob in the operation of a strip club.

Clearly, the jury was provided with more than sufficient evidence from which to determine the credibility of both Roselli and Droznek. Those witnesses were hardly left unscathed, notwithstanding the fact that Petitioner did not testify.

Moreover, to prevail on his ineffectiveness of counsel claim, Petitioner must show prejudice, meaning "that, but for counsel's alleged errors, the results of the proceedings would have been different." Strickland, 466 U.S. at 694. Prejudice does not exist where, even assuming some deficiency by counsel, the guilt of the defendant is overwhelming. See, Manley v. Ross Correctional Inst., 314 Fed. Appx. 776, 786 (6th Cir. 2008)(collecting cases).

Here, Droznek's testimony was particularly damning and, notwithstanding his checkered past, apparently believed by the jury. However, the jury did not just hear from Droznek and Roselli; they also heard from FBI agents involved in the case, and police officers who conducted surveillance on the Scoreboard sports bar when Droznek and Petitioner met. The jury also heard from a Plymouth police officer who testified that Petitioner did not seem surprised when the officer called to tell him they were investigating the "assault" on Collins.

Collins also testified about her stormy relationship with Petitioner and the receipt of flowers and the CD after the attack. Nancy Lee Ball told the jury she was an acquaintance of both Petitioner and Collins and that Petitioner had told her he was angry with Collins because she tried to ruin his business, had lied to him, was cheating on him, and that he wanted to kill Collins' dog.

Even Petitioner's own daughter testified that Collins "belittled" Petitioner, that Collins' placing her dog ahead of Petitioner "hurt" him, that Collins' relocation to Michigan was "traumatic" on Petitioner because he wanted to make things "work," and that he became "more and more upset" as the divorce proceedings went forward. Finally, the jury heard from Petitioner himself by way of the tape recorded conversation in which Petitioner acknowledged full involvement in the plot to harm
13

Collins, telling Droznek that she deserved it because of what she had done to him, and expressing happiness that Collins had been harmed.

Petitioner makes no effort to show how his testimony could have overcome the evidence presented to the jury. He has not shown prejudice.

Thus far, the Court has discussed ineffectiveness of counsel in relation to trial counsel's performance. Petitioner also makes a general claim that Robinson, his counsel on appeal, was ineffective because he did not raise trial counsel's failure to present Petitioner as a witness, even though counsel told the jury in opening statements that Petitioner would be called as a witness.

This claim fails because the Court has already determined that trial counsel was not ineffective within the meaning of Strickland. Moreover, Petitioner cannot show prejudice because ineffective assistance of counsel claims are routinely rejected on direct appeal, United States v. Martinez, 430 F.3d 317, 338 (6th Cir. 2005), including claims that counsel was ineffective because he failed to deliver on a promise made during opening statements, United States v. Robinson, 2007 WL 2112787 at *4 (6th Cir. 2007).

## IV. CONCLUSION

For the foregoing reasons, Petitioner's "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by Person in Federal Custody" (Docket Entry No. 1) will be denied and this case will be dismissed with prejudice. No certificate of appealability will issue because Petitioner cannot demonstrate that reasonable jurists would find debatable or wrong this Court's conclusion that counsel was not ineffective either at trial on appeal, or that any alleged ineffectiveness prejudiced the Petitioner. See Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

14

Case 3:09-cv-00589   Document 37   Filed 05/03/10   Page 14 of 14 PageID #: 115